UM

AO 91 (REV.5/85) Criminal Complaint                     AUSA Bolling W. Haxall (312) 353-8728

FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

OCT 2 5 2013
OCT 25 2013
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

MAGISTRATE JUDGE MASON

**UNITED STATES OF AMERICA**

v.

**JOHN M. SMITH,**
also known as "Dope Boy"

**CRIMINAL COMPLAINT**

CASE NUMBER: **13 CR 863**

**UNDER SEAL**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about November 23, 2010, at Chicago, in the Northern District of Illinois, Eastern Division, JOHN M. SMITH, also known as "Dope Boy," defendant herein:

> did knowingly and intentionally distribute a controlled substance, namely, 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance;

in violation of Title 21, United States Code, Section 841(a)(1). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
STEPHEN CUPP
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

October 25, 2013                                    at          Chicago, Illinois
Date                                                            City and State

MICHAEL T. MASON, U.S. Magistrate Judge
Name & Title of Judicial Officer                        Signature of Judicial Office

UNITED STATES DISTRICT COURT    )
                                    )     ss

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, STEPHEN CUPP, being duly sworn, state as follows:

1.    I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2007. My current responsibilities include the investigation of narcotics trafficking offenses.

2.    I have received specialized training in the enforcement of the Uniform Controlled Substances Act, among other statutes. In my experience conducting narcotics investigations, I have used a variety of investigative techniques, including undercover operations, informant development and handling, electronic and physical surveillance, and the debriefing of defendants, witnesses, and informants. Through my training and experience, I have learned of various methods and procedures by which drug trafficking organizations illegally import, transport, and distribute controlled substances.

3.    This affidavit is based on my personal knowledge, information provided to me by other law enforcement agents and in law enforcement records, information provided by a confidential source, a review of consensually recorded conversations and meetings, a review of public records databases, and my training and experience, as well as the training and experience of other law enforcement agents.

4.    This affidavit is submitted in support of a criminal complaint alleging

that, on or about November 23, 2010, JOHN M. SMITH, also known as "Dope Boy" ("SMITH"), did knowingly and intentionally distribute a controlled substance, namely 100 grams or more of a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that SMITH committed the offense alleged in the complaint.

## Facts Supporting Probable Cause

5.     In approximately Spring 2010, the FBI learned from a confidential source ("CS")[1] that an individual known to CS as "Dope Boy" was a Black Disciple gang member engaged in narcotics trafficking in Chicago, Illinois. In approximately August 2010, CS viewed the photograph associated with the State of Illinois Identification Card issued to SMITH and confirmed that he is the person known to CS as "Dope Boy."[2]

---

[1] CS has approximately five prior felony convictions, including two prior burglary convictions and three for narcotics violations. In addition, CS is currently charged in state court with aggravated battery with a firearm. This offense is alleged to have been committed subsequent to the assistance CS provided in this investigation. At the time of the investigation, CS was cooperating with law enforcement for financial gain. Based on his/her cooperation in this and other investigations, law enforcement paid CS approximately $38,679 for services and expenses.

[2] When asked to write the name by which he/she knew the individual depicted in the Illinois Secretary of State photograph, CS wrote "Doboy." However, he/she repeatedly informed agents that he/she knew SMITH as "Dope Boy."

6.      CS agreed to cooperate with the FBI by purchasing heroin from SMITH at the FBI's direction. As further described below, in October and early November, 2010, CS made three controlled purchases of heroin from SMITH totaling more than 80 grams. On November 23, 2010, CS made a controlled purchase of 109 grams of heroin from SMITH. Law enforcement conducted surveillance of each transaction and additionally recorded the meetings between SMITH and CS with audio and video equipment.

A.      **Prior controlled purchases of heroin from SMITH.**

(1)     *SMITH sells 14.4 grams of heroin to CS on October 14, 2010.*

7.      Based on a review of consensually recorded telephone calls, surveillance, and information provided by CS, on October 14, 2010, CS met with SMITH in the area of Van Buren Street and St. Louis Avenue in Chicago, Illinois, where SMITH sold CS approximately 14.4 grams of heroin in exchange for $1,275.

8.      On October 14, 2010, at approximately 11:44 a.m., CS placed a consensually recorded telephone call to SMITH.[3] During the call, CS asked SMITH,

---

[3] The identification of SMITH and his voice in this affidavit is based in part on the following: CS identified the person he/she spoke with during the consensually recorded telephone calls and met with during the recorded narcotics transactions set forth below as "Dope Boy." CS viewed the photograph associated with SMITH's state-issued Identification Card and identified him as "Dope Boy." Law enforcement agents also compared images recorded of the narcotics transactions with "Dope Boy," as set forth below, with the photograph of SMITH maintained by the Illinois Secretary of State and determined that the individual in the videos appears to be SMITH.

3

"You got some dog food [heroin]?"[4] When SMITH replied in the affirmative, CS said,
"I need 'bout like 25 [grams]." SMITH then said that he would call CS back after he
got off of work.

9.    At approximately 12:42 p.m., CS placed another consensually recorded
telephone call to SMITH. During the conversation, SMITH said, "I only got like 15
[grams of heroin] left." SMITH added, "They like 85 a piece [SMITH would charge
CS $85 per gram of heroin]." SMITH then directed CS to "come over to Van Buren
and St. Louis."

10.    At approximately 12:49 p.m., CS met with law enforcement at a
predetermined location to prepare for the narcotics transaction. At that time, agents
searched CS and CS's car for illegal narcotics or currency and found none. Agents
then provided CS with $1,280 in FBI funds to purchase heroin from SMITH, based
on the price SMITH quoted CS during the recorded telephone conversation ($85 per
gram). Agents also equipped CS with a concealed audio and video recording device

---

[4] At various points in this Affidavit, I will offer my interpretation of certain recorded
conversations in brackets and otherwise. My interpretation of these conversations is based
on my knowledge of the investigation to date and review of other interceptions, the content
and context of the conversation and prior and subsequent conversations, the results of
physical surveillance, conversations with the CS and law enforcement officers and agents,
and my experience and familiarity with these types of investigations. The summaries of
conversations do not include all potentially criminal conversations recorded during the
investigation or all statements or topics covered during the course of the recorded
conversations. The summaries do not represent final transcripts and may not represent the
entire conversation that occurred between the identified individuals.

and audio transmitter.[5] At approximately 1:00 p.m., agents observed CS drive from the meeting location to the area of Van Buren Street and St. Louis Avenue in Chicago. Agents conducted moving surveillance of CS as he/she drove to meet with SMITH.

11.     At approximately 1:09 p.m., law enforcement agents and officers conducting surveillance observed CS park his/her vehicle in the area of Van Buren Street and St. Louis Avenue. Approximately a minute later, surveillance observed SMITH approach CS's vehicle and enter it. A few moments later, surveillance observed SMITH exit CS's vehicle and enter another car parked on the street. SMITH then got out of the car and met with CS in the middle of the street, and a few moments later, briefly conversed with CS through the open passenger window of CS's vehicle. At approximately 1:13 p.m., surveillance observed CS drive away from the area. At approximately 1:14 p.m., surveillance observed SMITH enter the building located at 3502-3508 West Van Buren Street.

12.     Agents conducted surveillance of CS's vehicle until he/she arrived at the meeting location. CS then turned over to agents a clear plastic bag containing a light-brown, chalky substance. CS also provided agents with $5. Agents again

---

[5] Law enforcement agents used the same procedure for searching CS and CS's car for illegal narcotics before and after each transaction in which CS purchased narcotics from SMITH described below. Before each transaction, law enforcement agents gave CS money to buy heroin from SMITH. Law enforcement also installed a video and audio recording and transmitting device on CS. Surveillance followed CS to and from each meeting with SMITH and met with CS after each meeting, where law enforcement agents deactivated and removed the recording devices.

searched CS and CS's vehicle for narcotics or currency and found none. Agents also retrieved from CS the audio and video recording equipment.

13.     Agents attempted to review footage from the audio and video recorder and found that the equipment had failed and there was no recording.[6] Agents additionally debriefed CS about the narcotics transaction. According to CS, he/she observed SMITH exit a building on Van Buren Street, approach CS's vehicle, and enter the front passenger seat. At that time, CS provided $1,280 to SMITH, who gave CS an amount of heroin. According to CS, he/she asked for $5 back, but SMITH told CS that SMITH did not have $5. CS then observed SMITH exit CS's vehicle and briefly enter a car parked directly in front of CS. CS and SMITH then met in the middle of the street, where SMITH handed $5 to CS. CS and SMITH then had a brief conversation while CS was in his/her vehicle, and CS subsequently left the area.

14.     The chalky substance recovered from CS was sent for analysis to the Drug Enforcement Administration Laboratory. According to information provided by a DEA Forensic Chemist, the substance weighed approximately 14.4 grams and tested positive for heroin.

---

[6] Agents monitored the transaction in real time via an audio transmitter.

**(2)     SMITH sells 29.4 grams of heroin to CS on October 19, 2010.**

15.     Based on a review of consensually recorded telephone calls, audio and video recordings, surveillance, and information provided by CS, on October 19, 2010, CS met with SMITH inside the building located at 3502-3508 West Van Buren Street, Chicago, Illinois ("Van Buren building"), where SMITH sold CS approximately 29.4 grams of heroin in exchange for $2,550.

16.     On October 18, 2010, at approximately 1:13 p.m., CS placed a consensually recorded telephone call to SMITH. During this call, CS asked, "You have about 30 [grams of heroin] for me tomorrow, right?" SMITH replied, "Yeah." CS then said he/she would contact SMITH the following day.

17.     The next day, on October 19, 2010, at approximately 12:41 p.m., CS received a telephone call from SMITH, which was consensually recorded. During the call, SMITH said, "You can head over there where you came to last time [the area of Van Buren Street and St. Louis Avenue]." SMITH added that he would arrive at that location in about ten minutes.

18.     At approximately 12:43 p.m., CS met with law enforcement at a predetermined location to prepare for the narcotics transaction. At that time, agents searched CS and CS's car for illegal narcotics or currency and found none. Agents then provided CS with $2,550 in FBI funds to purchase heroin from SMITH, based on the price SMITH charged CS during the prior transaction ($85 per gram). Agents also equipped CS with a concealed audio and video recording device and audio

transmitter. At approximately 12:48 p.m., CS departed the location and drove toward the area of Van Buren Street and St. Louis Avenue. Agents conducted moving surveillance of CS's vehicle.

19.    At approximately 12:50 p.m., surveillance observed SMITH arrive in the area of Van Buren Street and St. Louis Avenue and park in front of the Van Buren building. At approximately 12:57 p.m., surveillance observed CS park his/her vehicle in the area of Van Buren Street and St. Louis Avenue and enter the Van Buren building. At approximately 1:00 p.m., surveillance observed CS exit the Van Buren building, return to his/her vehicle, and depart the area. Agents conducted surveillance of CS's vehicle until he/she arrived at the meeting location. CS then turned over to agents a clear plastic bag containing a light-brown, chalky substance. Agents again searched CS and CS's vehicle for narcotics or currency and found none. Agents also retrieved from CS the audio and video recording equipment.

20.    As captured by the audio and video recorder, at approximately 1:00 p.m., CS exited his/her vehicle, walked through a metal gate, and approached the Van Buren building.[7] After initially entering the building, CS then waited immediately outside the building's front door. At approximately 1:01 p.m., a black male met with CS just inside the entrance of the Van Buren building.[8] As captured

---

[7] The time stamp on the audio and video footage appears to be approximately two minutes behind the times contained in the surveillance report.

[8] During the subsequent debriefing with agents, discussed below, CS stated that SMITH is the individual who CS met with inside the Van Buren building and that SMITH

on the recording, the black male asked, "Where you selling this shit [heroin] at?" CS replied, "Lawndale and Ogden." CS then said, "That's twenty-five fifty [$2,550]," while holding an item that appeared to be a pile of money. The CS then handed the item to the black male, who handed an item to CS that appeared to be in plastic. At approximately 1:02 p.m., CS exited the Van Buren building, walked to his/her vehicle, and drove away.

21.     Agents subsequently debriefed CS about the narcotics transaction. According to CS, he/she observed SMITH come down the stairway on the right side of the Van Buren building and the CS then met with SMITH in the building's stairway area. CS confirmed that he/she gave $2,550 to SMITH, who provided CS with heroin.

22.     The chalky substance recovered from CS was sent for analysis to the DEA Laboratory. According to information provided by a DEA Forensic Chemist, the substance weighed approximately 29.4 grams and tested positive for heroin.

> **(3)     *SMITH sells 40.4 grams of heroin to CS on November 4, 2010.***

23.     Based on a review of consensually recorded telephone calls, audio and video recordings, surveillance, and information provided by CS, on November 4, 2010, CS met with SMITH inside SMITH's Infiniti sedan in the area of Harrison

---

provided heroin to CS. The video recorder did not capture SMITH's face during this transaction.

Street and Francisco Avenue in Chicago, where SMITH sold CS approximately 40.4 grams of heroin in exchange for $3,200.

24.     On November 4, 2010, at approximately 12:30 p.m., CS received a telephone call from SMITH; the call was consensually recorded. During the call, SMITH asked, "What you trying to do [how much heroin did CS want]?" CS replied, "I'm trying to do 50 [grams of heroin]." At approximately 1:43 p.m., CS placed a consensually recorded telephone call to SMITH. During this call, SMITH said, "I think I only got like 25 [grams of heroin]."

25.     At approximately 3:20 p.m., CS placed another consensually recorded telephone call to SMITH. During the call, SMITH told CS, "Meet me by the car wash on Harrison." At approximately 3:37 p.m., CS received a telephone call from SMITH; the call was consensually recorded. SMITH told CS, "He [SMITH's narcotics source of supply] only have 40 [grams of heroin]." CS and SMITH then planned to meet at the car wash on Harrison Street.

26.     At approximately 3:40 p.m., CS met with law enforcement at a predetermined location to prepare for the narcotics transaction. At that time, agents searched CS and CS's car for illegal narcotics or currency and found none. Agents then provided CS with $3,400 in FBI funds to purchase heroin from SMITH. Agents also equipped CS with a concealed audio and video recording device and audio transmitter. At approximately 3:43 p.m., CS departed the location and drove toward the area of West Harrison Street and South Francisco Avenue in Chicago. At that time, agents conducted moving surveillance of CS's vehicle.

27.     At approximately 3:48 p.m., surveillance observed SMITH arrive in a silver Infiniti sedan at the carwash located near the intersection of Harrison Street and Francisco Avenue. At approximately 3:51 p.m., surveillance observed CS arrive at the carwash. Surveillance observed CS and SMITH get into SMITH's silver Infiniti. Approximately two minutes later, surveillance observed CS exit the silver Infiniti, re-enter CS's vehicle, and drive away. Surveillance also observed SMITH drive away. Surveillance followed CS as he/she drove to the designated meeting location.

28.     At the meeting location, CS turned over to agents a clear plastic bag containing a light-gray, chalky substance. CS also provided agents with $100 remaining from the buy money. At that time, CS realized that he/she had inadvertently provided SMITH with $3,300 for the heroin, rather than the $3,200 that SMITH asked for in order to complete the transaction. Agents searched CS and CS's vehicle for narcotics or currency and found none. Agents also retrieved from CS the audio and video recording equipment.

29.     As captured by the audio recorder, moments after exiting his/her vehicle, CS met with SMITH. During their conversation, SMITH said, "There's forty-one in here [grams of heroin] too. You can just give me thirty-two [$3,200] for it." CS then said, "I'm gonna need like a hundred and ten [110 grams of heroin]." SMITH said that he was going out of town but that CS should call his phone and

11

SMITH's source of supply would provide CS with narcotics.[9] SMITH said, "Just call him [SMITH's narcotics supplier] and tell him what you want and he gonna take care of you [provide CS with narcotics]."

30.     At approximately 4:16 p.m., CS attempted three times to place a telephone call to SMITH, but the calls went to SMITH's voicemail. At approximately 4:19 p.m., CS received a telephone call from SMITH; the call was consensually recorded. CS told SMITH, "I gave you thirty-three [$3,300]." SMITH said, "Yeah, I just counted it [the money]. Yeah." CS said, "I'll just get it on the next batch [CS would apply the overpayment toward his next heroin purchase from SMITH]." SMITH replied, "Alright."

31.     Agents subsequently debriefed CS about the narcotics transaction. According to CS, he/she entered SMITH's car, which was parked near the car wash. SMITH then said he had 41 grams and was charging $3,200. CS handed the money to SMITH, who provided CS with the bag of heroin. SMITH also informed CS that SMITH was going to be out of town for a week, but that SMITH's man – which CS understood to be SMITH's heroin source of supply – would take care of CS. CS also told SMITH that CS wanted to purchase 110 grams of heroin. According to CS, he/she then got out of SMITH's car and left the area.

_____

[9] SMITH informed CS that he would be leaving the country on "Saturday" (November 7, 2010) to travel to Brazil and would return on the "following Monday" (November 15, 2010). According to records acquired from a law enforcement database, SMITH departed the United States from Miami, Florida on Saturday, November 7, 2010, arriving in the Cayman Islands, and returned to Miami from Mexico on Sunday, November 14, 2010.

32.     The chalky substance recovered from CS was sent for analysis to the DEA Laboratory. According to information provided by a DEA Forensic Chemist, the substance weighed approximately 40.4 grams and tested positive for heroin.

**B.      SMITH sells 109.0 grams of heroin to CS on November 23, 2010.**

33.     Based on a review of consensually recorded telephone calls, audio and video recordings, surveillance, and information provided by CS, on November 23, 2010, CS met with SMITH inside SMITH's Infiniti sedan in the area of Kedzie Avenue and Washington Boulevard in Chicago, where SMITH sold CS approximately 109 grams of heroin in exchange for $9,100.

34.     On November 22, 2010, at approximately 10:55 a.m., CS placed a consensually recorded telephone call to SMITH. During this call, CS said, "Tomorrow, my people [narcotics customers] are be coming through, around about twelve, one [o'clock]. You know how much I want, right?" SMITH asked, "What you want?" CS replied, "The dog food [heroin], Joe." SMITH said, "Right I know, what you want?" CS replied, "One-ten [110 grams]." SMITH replied, "All right."

35.     The next day, on November 23, 2010, CS had multiple consensually recorded telephone conversations with SMITH. At approximately 2:41 p.m., CS received a call from SMITH. During the conversation, SMITH said, "I'm waiting on him [SMITH's narcotics source] to bring it [heroin] to me now [UI], he had it at his crib, I ain't about to keep this shit around." At approximately 3:31 p.m., CS received a telephone call from SMITH. During this call, Smith told CS to meet him at Kedzie and Washington.

36. At around that same time, agents equipped CS with a concealed audio and video recording device and audio transmitter. Earlier that afternoon, at approximately 12:35 p.m., agents searched CS and CS's car for illegal narcotics and found none. Agents remained with CS until he/she received the call from SMITH directing the CS to Kedzie and Washington. Agents also provided CS with $9,250 in FBI funds to purchase heroin from SMITH, which amount CS believed was sufficient as SMITH still owed CS $100 from the previous overpayment, as described above.

37. At approximately 3:37 p.m., CS departed the meet location and agents conducted moving surveillance of his/her vehicle. At approximately 3:48 p.m., surveillance observed CS park his/her car in the area of Washington Boulevard and Kedzie Avenue in Chicago. Surveillance observed that SMITH was waiting in the driver's seat of a black Infiniti sedan, parked on Washington Boulevard. Surveillance then observed CS enter the black Infiniti and sit in the front passenger seat, next to SMITH.

38. Shortly thereafter, surveillance observed a white Pontiac Grand Am arrive in the area of West Washington Boulevard and park in front of the black Infiniti occupied by SMITH and CS. Surveillance observed the driver of the Grand Am, FNU LNU 1, exit his car and enter the black Infiniti. A short time later, FNU LNU 1 exited SMITH's car, re-entered the Grand Am, and drove away.

39. At approximately 4:10 p.m., surveillance observed a blue Chevrolet Avalanche park in the area of West Washington Boulevard. Surveillance then

14

observed SMITH exit the black Infiniti and accompany an occupant of the blue Avalanche into the building located at 3213 West Washington Boulevard. Surveillance observed that CS remained alone in the black Infiniti.

40. At approximately 4:27 p.m., surveillance observed SMITH exit the building located at 3213 West Washington Boulevard, re-enter the black Infiniti and sit in the driver's seat, next to CS.

41. At approximately 4:28 p.m., surveillance observed CS exit the black Infiniti and return to his/her car. Surveillance then observed CS drive away from Washington Boulevard; agents conducted surveillance of CS's vehicle until he/she returned to the meeting location. CS then met with agents and turned over a clear plastic bag containing three smaller bags. Within each of the smaller bags was a light-gray, chalky substance. In addition, CS provided agents with approximately $250 remaining from the buy money. Agents again searched CS and CS's vehicle for narcotics or currency and found none. Agents also retrieved from CS the audio and video recording equipment.

42. As captured by the audio recorder, after CS entered SMITH's car, the two discussed narcotics for several minutes. The two talked about the color of heroin, "re-rocking" – a process by which narcotics traffickers dilute a controlled substance, and narcotics pricing. Later, as captured by the audio recorder, SMITH exited, leaving CS alone in the car. Some time later, SMITH returned to the car. At that time, SMITH said, "The ten [grams of heroin] is separate." CS asked, "The ten is separate?" SMITH replied, "Yeah, it's in two 50s [two 50 gram quantities plus 10

grams, to total 110 grams]." At about that time, SMITH's face was captured by the video recorder. Moments later, CS exited the car and returned to his/her own vehicle.

43.     Agents subsequently debriefed CS about the narcotics transaction. According to CS, he/she entered SMITH's vehicle and waited with SMITH. Some time later, an unknown male, FNU LNU 1, arrived in a white Grand Am, entered the back seat of SMITH's vehicle and handed SMITH an amount of heroin, which CS estimated to be approximately 10 grams. FNU LNU 1 then exited SMITH's car and drove away. CS then asked SMITH how much the heroin would cost and SMITH said $9,000. CS then counted out $9,000 from the buy money supplied by the FBI and gave it to SMITH. Sometime later, a blue Avalanche arrived and its front passenger, FNU LNU 2, exited the car and walked toward SMITH's vehicle. SMITH and FNU LNU 2 then entered the building located on Washington Boulevard. The driver of the blue Avalanche, FNU LNU 3, also exited the car and entered the same building. A short time later, SMITH exited the building and returned to SMITH's car. At that time, SMITH provided CS with heroin and told CS that it was broken into two quantities of 50 grams and one quantity of 10 grams. CS then exited SMITH's car, got into CS's vehicle, and drove directly to the pre-determined meeting location.

44.     The substance recovered from CS was sent for analysis to the DEA Laboratory. According to information provided by a DEA Forensic Chemist, the substance weighed approximately 109.0 grams and tested positive for heroin.

45.     Based on the information in this affidavit, there is probable cause to believe that on or about November 23, 2010, JOHN M. SMITH did knowingly and intentionally distribute a controlled substance, namely 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).


FURTHER AFFIANT SAYETH NOT.


STEPHEN CUPP
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN to before me on October 25, 2013.


MICHAEL T. MASON
United States Magistrate Judge